IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DENNIS ALAN DAVIS, (TDCJ-CID #498745) | § § § § § | |
| Plaintiff, | | |
| vs. | § | CIVIL ACTION H-11-2755 |
| LANNETTE LITHICUM, et al., | § § § § | |
| Defendants. | | |

**MEMORANDUM AND OPINION**

Dennis Alan Davis, an inmate of the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ), sued in July 2011, alleging a denial of adequate medical care. Davis, proceeding *pro se* and *in forma pauperis*, sued the TDCJ District Medical Director; the Director of the Correctional Managed Care pharmacy; a physician at the Ellis Unit and Medical Director at the University of Texas Medical Branch (UTMB); and a pharmacist at the Correctional Managed Care Pharmacy. A review of the pleadings and submissions leads the court to conclude that Davis's claims lack merit as a matter of law. This case is therefore dismissed.

**I. Background**

In his complaint, Davis alleges that he has a documented history of restless leg syndrome ("RLS"), a neurological condition that leads to severe discomfort. Davis alleges that he complained repeatedly to unit medical staff and Mental Health Services as his symptoms worsened over the past few years. He alleges moderate to severe muscle seizures in both legs and arms, chronic insomnia, and mental anxiety.

Beginning in 2003, when Davis complained to prison medical staff about his RLS, he was prescribed minor pain medications and drugs such as antidepressants. Davis had to stop taking some of the drugs due to severe side effects. Davis states that all the drugs he received were ineffective in treating his RLS.

Davis asserts that in 2007, Dr. Williams, his treating physician at the Ellis Unit, denied his request to see a neurologist. On April 14, 2008, Davis again asked to be seen by a neurologist and was again denied. Dr. Williams prescribed another medication, Tegretol (Carbamazepine), an antiepileptic. Davis asserts that using this drug to treat RLS was an off-label use. On November 2, 2010, Davis complained to Dr. Williams that the Tegretol was ineffective to control his RLS symptoms. Dr. Williams then referred Davis to a neurologist at UTMB, explaining that there was no other drug available in the prison pharmacy she could use to treat Davis's symptoms.

On November 6, 2010, Davis complained to Ray Carpentier with the unit Mental Health Services Department, about his severe insomnia, chronic pain, and muscle seizures. On November 12, 2010, a prison psychiatrist noted that Davis's RLS symptoms in both legs and arms had a high severity rating. The psychiatrist discontinued the antidepressant Celexa, which was aggravating the RLS symptoms, condition, and placed Davis on a low dose of Prozac.

On January 25, 2011, Davis was examined by doctors at UTMB's Department of Neurology. They diagnosed moderate to severe RLS and prescribed Mirapex, one of two drugs approved by the FDA to treat the disease, with an order stating, "Patient will need Mirapex as medically necessary treatment for his RLS symptoms." The neurologists also ordered blood tests. A nurse faxed the prescriptions to Davis's unit. The neurologists ordered a medical telemed conference in six weeks to check the Mirapex dosage level. The neurologists discontinued the Prozac and Carbamazepine,

noting that these were the wrong medications for RLS and were likely aggravating Davis's symptoms.

Davis alleges that Mirapex was categorized as a "non-formulary" medication that is not approved in advance by a unit clinical pharmacist before it is prescribed but is subject to approval after. Davis alleged that Dr. Williams, his treating doctor at the Unit, ordered Mirapex by e-mail sent to the Correctional Managed Care (CMC) Pharmacy in Huntsville, Texas and attached the "medically necessary" order from the neurologists on the prescription. The prescription order was denied by the CMC Pharmacy. Davis was also denied the prescribed blood test.

Davis claims that Dr. Williams had an obligation to appeal the denial of the prescription order because no other drug besides Mirapex was available and it had been prescribed by a neurology specialist. Davis informed Dr. Williams in writing that she could have appealed the prescription order denial to the Director of the TDCJ Health Services Division. Davis alleges that Dr. Williams's failure to do so shows deliberate indifference to Davis's medical needs.

On February 28, 2011, Davis's family contacted TDCJ Health Services Division in Huntsville. They were directed to Anita Weaver, a medical liaison and a representative between the public and the Texas Department of Criminal Justice. She promised an investigation. On March 25, 2011, Anita Weaver responded by stating, "this medication causes too many psych problems among inmates."

On April 1, 2011, Davis had an appointment with Dr. Williams. Davis tried once more to get Mirapex for his RLS. Dr. Williams stated "there was nothing else" she could do to get him the drug. On April 7, 2011, the medical telemed conference that the neurologists had ordered was cancelled.

Davis alleges that he has received various medications in the past 10 to 12 years for his RLS symptoms, but all were off-label uses. Davis alleges that he received the following medications for RLS:

    (a)    Indocin: an analgesic given for leg pain.

    (b)    Nortriptyline: an antidepressant that was also discontinued due to severe side effects.

    (c)    Carbamazepine: (Tegretol) An antiepileptic agent given for Davis's severe leg and arm seizures. This medication was ineffective and deemed an improper use by neurologists.

    (d)    Prozac: This antidepressant was used for a short period in conjunction with Hepatitis C treatment and for RLS-related depression. This medication was discontinued by the neurologists.

Davis filed a Step 1 Grievance on April 4, 2011. Prison officials responded as follows:

> Grievance Response:
> The Facility Medical Department has no control or authority over central pharmacy. You may submit a I-60 and ask why the medication was denied. Dr. Williams saw you on 4/1/11[.] You were referred to neuro for any additional action deemed necessary. The appointment is still pending. No further action warranted.

(Docket Entry No. 14-1, Plaintiff's More Definite Statement, Exh. 6-B, p. 10).

Davis filed a Step 2 Grievance on April 26, 2011. Prison officials responded as follows:

> A review of your grievance regarding a prescription for the non-formulary medication pramipexole has been completed. The record indicates that the request for the non-formulary medication pramipexole was denied by the pharmacy. Please be advised that the prescribing of medication in the correctional managed health care system is accomplished utilizing medications approved for the

> Correctional Managed Care (CMC) Formulary. However, treatment for offenders is not limited to the formulary and non-formulary requests for other medications may be submitted by the facility medical provider as the provider deems appropriate. These non-formulary requests must then be approved by the assigned clinical pharmacist who reviews such requests to confirm that a drug is necessary to the offender's treatment plan, and that no acceptable substitute is available on the CMC Formulary. If you feel that your medical condition has changed to warrant additional evaluation for possible medications, you may wish to submit a Sick Call Request to the Facility Medical Department. No action is warranted through the grievance mechanism.

(Docket Entry No. 14-1, Plaintiff's More Definite Statement, Exh. 7-B, p. 12).

Davis seeks a declaratory judgment that the defendants have violated his civil rights; an injunction requiring the defendants to provide him Mirapex; unspecified compensatory damages; and unspecified punitive damages.

## II. The Standard of Review

A district court must dismiss a prisoner's IFP § 1983 complaint if the action is malicious or frivolous, fails to state a claim, or seeks monetary relief from a defendant who is immune. 28 U.S.C. § 1915(e)(2)(B). Under 28 U.S.C. § 1915(e)(2)(B)(i), the court may dismiss an *in forma pauperis* complaint as frivolous when it lacks an arguable basis in law or fact. *Hutchins v. McDaniels*, 512 F.3d 193, 195 (5th Cir. 2007) (citing *Black v. Warren*, 134 F.3d 732, 734 (5th Cir. 1998)). "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998)(quoting *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997)). The court may dismiss the claim "'before service of process or before the filing of the

answer' as long as certain safeguards are met." *Brewster v. Dretke*, 587 F.3d 764, 767 (5th Cir. 2009) (quoting *Ali v. Higgs*, 892 F.2d 438, 440 (5th Cir. 1990)).

### III. The Record

On August 8, 2012, this court ordered the Attorney General's Office for the State of Texas to provide relevant medical and grievance records for Davis for the period from September 1, 2010 to the present. (Docket Entry No. 21). On October 3, 2012, the Attorney General's Office submitted the following records:

(1) Health Services Archive Records for Davis, with an affidavit of Lisa Lopez, Custodian of Records at the University of Texas Medical Branch - Correctional Managed Care Health Services Archives. (Docket Entry No. 24, pp. 1-525).

(2) University of Texas Medical Branch Records, with an affidavit of Philip Chacko, Custodian of the Records of the University of Texas Medical Branch Hospitals. (Docket Entry No. 24, pp. 526-769).

(3) Grievance/patient liaison records, with an affidavit of Cathy Hager, Research Specialist III for the Office of Professional Standards for the TDCJ Health Services Division. (Docket Entry No. 24, pp. 770-90).

(4) Medication Compliance Records, with an affidavit of William D. Toney. (Docket Entry No. 24, pp. 791-1052).

The records detail the treatment Davis received from September 1, 2010 to September 10, 2012. The medical records show that Davis received treatment for various conditions besides RLS, including hypertension, Hepatitis C virus, coronary artery disease, depression, and thyroiditis. The extensive notes from the medical staff are summarized below.

1. July 2010: started interferon treatment for Hepatitis C.

2. September 14, 2010: mental health evaluation; mood disorder due to general medical condition.

3. October 6, 2010: mental health evaluation: improved mood; no crying spells since prescribed Celexa; treating depression related to Interferon treatment; reported having RLS since his teens and that he takes medication that helps; leg cramps are more frequent after starting Celexa; referred to neurology.

4. October 10, 2010: mental health evaluation: complained that Celexa aggravated his RLS; he was prescribed Celexa, but will be prescribed Prozac; no depression or distress noted.

5. October 13, 2010: prescribed Nitrostat for chest pain.

6. December 2, 2010: annual physical.

7. December 9, 2010: mental Health evaluation: Davis reported improved mood on Prozac; continues to have problem with RLS; has appointment with neurology; reported weight loss since starting Interferon; complains of fatigue related to the treatment.

8. January 3, 2011: interferon treatment placed on hold at week 26 because Davis developed hyperthyroidism.

9. January 10, 2011: mental health evaluation.

10. January 25, 2011: seen by neurology; 53-year-old male; history of Hepatitis C virus; complained of lower extremity parasthesias and pain; pain is worse at night when lying down; symptoms began thirty years ago; symptoms

progressively worsen over last few years; report extreme difficulty sleeping, secondary to symptoms; symptoms relieved by leg massage and walking; has been taking Tegretol for the past two years without relief; denies muscle pain or weakness throughout the day; denies gait disturbances; has Hepatitis C, hyperthyroidism; needs workouts to rule out other causes of RLS; plan: Vitamin B12; Vitamin B1, plasma; Vitamin B6, plasma; Iron Serum; Ferritin serum; thyroid stimulating hormone; Primapexol/Mirapex 2 hours before bed; follow up in six weeks in neurology tele-medicine clinic. Discontinue Fluoxitine/Prozac; alternate therapy prescribed Mirapex; duration two months; treatment for RLS; medically necessary; the prescription order stated: "A generic drug will be dispensed unless the practitioner handwrites the words brand necessary or brand medically necessary on the face of the prescription."

11. January 28, 2011: mental health evaluation: treatment for Hepatitis C was discontinued before completion; reported going to neurology department in Galveston; he was put on medication; he was told that Prozac can exacerbate the problem; he was told that it was best not to continue Prozac; Davis reported no depression side effects since he was taken off of Interferon therapy; Davis requested that Prozac be discontinued.

12. January 28, 2011: Dr. Williams prescribed Mirapex relating to diagnosis of RLS; justification - failed Tegretol.

13. February 1, 2011: mental health evaluation.

14. February 10, 2011: mental health service Individual Treatment Plan: reported being on Prozac for side effects to Interferon treatment; he was having side effects to Prozac for RLS and chose to stop Prozac; he would be monitored for ninety days for possible recurrence of side effects.

15. February 11, 2011: Davis complained that though Dr. Williams had ordered Mirapex, he had not received the medication; P.A. Sanchez responded that the pharmacy had denied the request for Mirapex, a nonformulary medication, on February 2, 2011.

16. February 11, 2011: cholecystectomy (gallbladder removal surgery) at UTMB Hospital Galveston.

17. February 14, 2011: follow-up visit after return from Hospital Galveston for emergency gallbladder surgery; hyperthyroidism secondary to interferon treatment; prescribed thyroid stimulating hormone; Interferon treatment for Hepatitis C.

18. February 18, 2011: staple removal following surgery; complained of rash on face; prescribed hydrocortisone cream.

19. March 1, 2011: follow-up to monitor hyperthyroidism associated with Interferon treatment; responded well to Methimidazole; showing signs of hypothyroidism; Iatrogenic thyroid disorder after Interferon treatment; discontinue Methimidazole; order lab work; schedule follow-up for April 1, 2011.

20. March 2, 2011: Davis's mother asked why he was not receiving Mirapex; prison officials investigated and provided the following response on March 23, 2011:

> [Davis] was evaluated by the neurologist on 01/25/2011 for his complaints of RLS. The specialist recommended he be prescribed the non-formulary medication Pramipexole .25 mg (Mirapex) and follow up in the neurology telemedicine clinic in 6 weeks. Her son was seen by the facility provider on 01/28/2011 and a non-formulary request was submitted to the pharmacy but this medication was deferred on 02/01/2011 and his Tegretol medication was continued for his RLS. She was informed that this investigator had spoken with the pharmacist and per the pharmacist his Mirapex was deferred due to a high degree of psychological effects and this drug is not generally used in the prison population. The pharmacist also noted that her son's Tegretol compliance was 21/31 doses which means he not taking his medication every day like ordered. She was also informed that he is currently scheduled to be seen in the neurology telemedicine clinic on 04/2011. She was informed that this investigation will be closed and to contact the facility directly or Huntsville if she has any more concerns with a verbal understanding.

(Docket Entry No. 24, p. 785).

21. March 26, 2011: prescribed treatment for skin rash.

22. April 7, 2011: complained of RLS; missed follow-up appointment with neurology.

23. May 6, 2011: dental appointment.

24. May 9, 2011: in a letter to Ellis Unit Mental Health Services, Ray Carpentier, Davis explained that he was prescribed Celexa and Prozac. Medical

personnel discontinued Celexa because it was causing his RLS to worsen. Davis was placed on a low dose of Prozac and this reduced his RLS symptoms.

25. June 3, 2011: medical personnel determined that referral to neurology was not medically necessary.

26. July 30, 2011: requested appointment with neurology in Galveston. Medical personnel advised him that he was not scheduled for any appointments with neurology.

27. August 5, 2011: mental health evaluation.

28. August 22, 2011: seen for contact dermatitis/fungal infection, right foot; prescribed Tolnaftate cream.

29. August 25, 2011: visual acuity test administered.

30. October 13, 2010: refused treatment for Hepatitis C.

31. October 28, 2011: requested dentures; he was determined to be ineligible for dentures.

32. February 16, 2012: Davis complained of inaccuracies in his annual health report; prison officials responded that medical records showed that he had been referred to neurology, but he was not seen; he was medically evaluated on December 5, 2011; he was seen on February 13, 2012, at which time Davis requested to stop certain medications; he had an upcoming chronic care appointment on March 30, 2012.

33. May 9, 2012: in a grievance, Davis complained that he was denied an appointment with neurology; prison officials responded that Davis had had an appointment with Dr. Williams on March 26, 2012, at which time he requested a referral to the endocrinology department; Davis made no request for a referral to the neurology department at that time.

34. May 29, 2012: evaluated for thyroid condition; fluctuates between hyperthyroid and hypothyroid; prescribed Synthroid and thyroid stimulating hormone.

35. June 4, 2012: seen by Dr. Williams following referral to endocrinology clinic in UTMB Galveston.

Davis was prescribed the following medications for his various conditions:

(1) Benadryl;

(2) Enalapril Maleate;

(3) Ecotrin EC;

(4) Folvite;

(5) Folic Acid;

(6) Hytrin;

(7) Hydrodiuril;

(8) Havrix;

(9) Hydrochlorothiazide;

(10) Inderal;

(11) Levothyroxine;

 (12) Lopressor;

 (13) Metoprolol;

 (14) Nitrostat;

 (15) Omeprazole;

 (16) Prilosec;

 (17) Pegasys;

 (18) Ribavirin;

 (19) Selsun;

 (20) Synthroid;

 (21) Celexa;

 (22) Tegretol;

 (23) Tapazole;

 (24) Tylenol with codeine;

 (25) thiamine (vitamin B-1);

 (26) Terazosin; and

 (27) Vasotec.

## IV. The Claim of an Unconstitutional Denial of Medical Care

"[I]nadequate medical care by a prison doctor can result in a constitutional violation for purposes of a § 1983 claim when that conduct amounts to deliberate indifference to [the prisoner's] serious medical needs, constitut[ing] the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Stewart v. Murphy,* 174 F.3d 530, 533 (5th Cir. 1999) (quoting *Estelle v. Gamble,* 429 U.S. 97 (1976)). Under the "deliberate indifference" standard, a prison official is not

liable for the denial of medical treatment "unless the official knows of and disregards an excessive risk to inmate health or safety." *Stewart*, 174 F.3d at 534 (citing *Estelle*, 429 U.S. at 104). While malpractice and negligent treatment do not rise to the level of a constitutional tort, *see Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993), a claim of "unnecessary and wanton infliction of pain repugnant to the conscience of mankind," can state a constitutional tort. *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citing *Estelle*, 429 U.S. at 105-106).

To state an Eighth Amendment claim, a plaintiff must allege a deprivation of medical care sufficiently serious to show that "the state has abdicated a constitutionally-required responsibility to attend to his medical needs," *Bienvenu v. Beauregard Parish Police Jury*, 705 F.2d 1457, 1460 (5th Cir. 1983), and that a prison official knew of and disregarded "an excessive risk to inmate health or safety." *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998)(quoting *Farmer*, 511 U.S. at 837). "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk." *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994) (citing *Farmer*, 511 U.S. at 842 & n.8).

The administrative records show that Davis was examined by medical personnel and prescribed medications many times over a two-year period. Medical personnel treated his RLS with Tegretol. Following a consult with the neurology department at UTMB Galveston, the neurologists prescribed Mirapex. Based on the consult, the unit physician, Dr. Williams, prescribed Mirapex to treat Davis's RLS. TDCJ clinical pharmacists determined that Mirapex carried a high risk of

psychological side effects that made it inappropriate for the prison population. Davis was prescribed Tegretol, the medication he had previously been prescribed for his RLS. Prison officials noted that Davis failed to take the Tegretol as prescribed, which could explain why it was not relieving his symptoms.

In addition to treating Davis's RLS, medical personnel addressed and treated his other medical conditions, including hypertension, Hepatitis C virus, coronary artery disease, depression, and thyroiditis. Medical personnel evaluated Davis's blood test results and adjusted his medications accordingly. Davis received many medications for his various conditions. Of the 1,052 pages of the administrative record, 261 pages detail Davis's medications. This evidence of repeated examinations and treatment negate Davis's claim of deliberate indifference. *Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977). The extensive medical records showing repeated and frequent examinations, diagnoses, and medications rebut Davis's allegations of deliberate indifference. *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993). Davis was seen by medical personnel on numerous occasions, and his various medical conditions were addressed. Davis has not alleged facts demonstrating that the defendants were aware of, and disregarded, a substantial risk of harm to Davis.

The deliberate indifference standard is exacting. An incorrect diagnosis by prison medical personnel is not sufficient to show deliberate indifference. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (citing *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). The plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson*, 759 F.2d at 1238. The decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429

U.S. at 107. And the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

Davis alleges that because Dr. Williams failed to appeal the pharmacist's decision not to provide Mirapex, that shows deliberate indifference. Dr. Williams's decision not to appeal the denial with the conclusion that Mirapex was inappropriate because of the side effects is a decision about medical treatment by Davis's treating doctor. "Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimizana*, 122 F.3d 286, 292 (5th Cir. 1997).

Davis alleges that because a pharmacist was able to override the medical judgment of the neurologists that shows deliberate indifference. As detailed in the response to Davis's Step 2 Grievance, the TDCJ-CID has a procedure for approving medications within the prison. The record shows that the pharmacist declined to fill the Mirapex prescription because it had side effects and was not suitable for the prison population. Davis's treating physician declined to challenge this denial. The decision reflects both medical-treatment judgment and a judgment about how to apply policies and practices designed to maintain security and preserve internal order. *McCord v. Maggio*, 910 F.2d 1248 (5th Cir. 1990) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). A court may not second-guess prison officials' good faith assessment of the facts before them in making such decisions.

Davis alleges that since January 2011, he has not received any medication for his RLS. The court has reviewed the extensive medical records. They show that Davis refused to take the medications prescribed to him and instead asked for Mirapex. Following the denial of Mirapex, Davis did not complain about his RLS or request a medication other than Mirapex.

Davis's claim for the denial of medical care is dismissed under 28 U.S.C. § 1915(e)(2).

## V.     Conclusion

This action is dismissed with prejudice under 28 U.S.C. § 1915(e)(2)(B)(i). Davis's motion to expedite, (Docket Entry No. 25), is granted *nunc pro tunc.* Davis's motion to preserve evidence, (Docket Entry No. 28), is denied as moot. Any remaining pending motions are denied as moot.

The Clerk will provide a copy of this order by regular mail, facsimile transmission, or e-mail to:

(1)     the TDCJ - Office of the General Counsel, Capitol Station, P.O. Box 13084, Austin, Texas, 78711, Fax: 512-936-2159;

(2)     the Inmate Trust Fund, P.O. Box 629, Huntsville, Texas 77342-0629, Fax: 936-437-4793; and

(3)     the District Clerk for the Eastern District of Texas, 211 West Ferguson, Tyler, Texas 75702, Attention: Manager of the Three-Strikes List.

SIGNED on June 3, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge